IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 15-4322

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

MICHAEL T. RAND,

*Defendant – Appellant*,

---

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Robert J. Conrad, District Judge*

---

# BRIEF OF THE UNITED STATES

---


Jill Westmoreland Rose
United States Attorney

Amy E. Ray
Assistant United States Attorney
United States Courthouse
Room 233
100 Otis Street
Asheville, North Carolina 28801
(828) 271-4661

Maria K. Vento
Assistant United States Attorney
227 West Trade Street
Carillon Building
Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iv

JURISDICTIONAL STATEMENT ........ 1

ISSUES PRESENTED ........ 1

STATEMENT OF THE CASE ........ 2

1. Rand leads a "cookie jar" accounting scheme to defraud investors and the public. ........ 2

2. Rand ignores accounting rules that prohibit the realization of profit from the sale of model homes if the builder has any continuing involvement in the homes. ........ 7

3. The FBI opens an investigation into Beazer's mortgage business; Rand deletes thousands of e-mails after learning of the grand jury's subpoena. ........ 9

4. Rand confesses to deleting e-mail messages and to improper accounting practices. ........ 12

5. Rand is convicted by a jury of conspiracy and obstruction-of-justice offenses. ........ 15

   a. Rand's case is tried by a jury who hears evidence that Rand deleted more than 3,000 e-mails between March 23 and March 28, 2007, and approximately 6,000 e-mails on March 30, 2007. ........ 15

   b. The district court denies Rand's motion to subpoena voluminous Beazer accounting records. ........ 17

   c. The district court permits the government to elicit testimony from lay witnesses that certain accounting practices were improper. ........ 19

d. The district court denies Rand's motion to present evidence that he was previously accused of deleting e-mails that he did not, in fact, delete. .......................... 20

e. The district court admits Rand's accounting-expert testimony on the propriety of accounting entries but excludes evidence of auditor work papers. .................... 25

f. At the conclusion of the second jury trial, Rand is convicted on all counts. ................................................ 26

i. Rand's former colleagues are permitted to testify to transactions in which they participated that they believed were inappropriate.................................... 26

ii. Rand presents his defense........................................ 27

iii. On rebuttal, the government introduces evidence of Rand's confession.................................................... 28

iv. Both parties refer to gold in their closing arguments.................................................................. 31

6. The district court sentences Rand to a downward-variance sentence of 120 months in prison.......................................... 34

SUMMARY OF THE ARGUMENT ........................................................ 37

ARGUMENT .................................................................................. 40

I. The district court acted within its discretion by permitting Rand to explain why he confessed but declining to permit him to present evidence that he formerly had been accused of deleting certain e-mails.................................................................. 40

A. Standard of Review .............................................................. 40

B. Discussion.............................................................................. 42

II. The district court's other evidentiary rulings were proper. .......... 51

A. Standard of Review .......... 51

B. Discussion .......... 52

1. The district court acted within its discretion in denying Rand's request for voluminous, irrelevant accounting records. .......... 52

2. The district court acted within its discretion by excluding expert testimony about Deloitte work papers. .......... 54

3. The district court acted within its discretion in admitting lay-opinion testimony. .......... 57

4. The district court's evidentiary rulings did not result in cumulative error. .......... 59

III. The district court did not plainly err in declining to grant a mistrial based on the government's rebuttal closing argument. .......... 60

A. Standard of Review .......... 60

B. Discussion .......... 61

IV. The district court properly calculated loss pursuant to 2B1.1 .......... 64

A. Standard of Review .......... 64

B. Discussion .......... 64

CONCLUSION .......... 68

REQUEST FOR DECISION ON THE BRIEFS .......... 69

CERTIFICATION OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Crane v. Kentucky*,
476 U.S. 683 (1986) .......... 47, 48

*Daubert v. Merrell Down Pharmaceuticals*,
509 U.S. 579 (1993) .......... 55

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 67

*In re Martin Marietta Corp.*,
856 F.2d 619 (4th Cir. 1988) .......... 52, 53

*Kotteakos v. United States*,
328 U.S. 750 (1946) .......... 50

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .......... 67

*United States v. Al-Amin*,
2013 WL 3865079 (E.D. Tenn. 2013) .......... 54

*United States v. Baptiste*,
596 F.3d 214 (4th Cir. 2010) .......... 61

*United States v. Berger*,
587 F.3d 1038 (9th Cir. 2009) .......... 67

*United States v. Blake*,
571 F.3d 331 (4th Cir. 2009) .......... 41

*United States v. Brainard*,
690 F.2d 1117 (4th Cir. 1982) .......... 60

*United States v. Briley,*
70 F.3d 267 (4th Cir. 2014) .......... 50

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006) .................... 58, 59, 68

*United States v. Georgiou*,
777 F.3d 125 (3rd Cir. 2015) .................... 67

*United States v. Gillion*,
704 F.3d 284 (4th Cir. 2012) .................... 51

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) .................... 67

*United States v. Johnson*,
587 F.3d 625 (4th Cir. 2009) .................... 56

*United States v. Keita*,
742 F.3d 184 (4th Cir. 2014) .................... 64, 65

*United States v. Lighty*,
616 F.3d 321 (4th Cir. 2010) .................... 61

*United States v. Malloy*,
568 F.3d 166 (4th Cir. 2009) .................... 40, 41

*United States v. Nixon*,
418 U.S. 638 (1974) .................... 18, 19, 52, 53

*United States v. Nosal,*
249 F.R.D. 403 (N.D. Cal. 2013) .................... 54

*United States v. Offill*,
666 F.3d 168 (4th Cir. 2011) .................... 57, 58, 59

*United States v. Olis*,
429 F.3d 540 (5th Cir. 2005) .................... 67, 68

*United States v. Pablo*,
696 F.3d 1280 (10th Cir. 2012) .................... 56

*United States v. Peppel*,
707 F.3d 627 (6th Cir. 2013) .................... 67

*United States v. Prince-Oyibo*,
320 F.3d 494 (4th Cir. 2003) .................................................. 42

*United States v. Rand*,
2013 WL 4782607 (W.D.N.C. 2013) .................................................. 17

*United States v. Richardson*,
607 F.3d 357 (4th Cir. 2010) .................................................. 51, 52, 53

*United States v. Rutkoske*,
506 F.3d 170 (2d Cir. 2007) .................................................. 68

*United States v. Tucker*,
249 F.R.D. 58 (S.D.N.Y. 2008) .................................................. 54

*United States v. Williams*,
632 F.3d 129 (4th Cir. 2011) .................................................. 40, 41

*United States v. Wilson*,
135 F.3d 291 (4th Cir. 1998) .................................................. 61

*United States v. Woods*,
710 F.3d 195 (4th Cir. 2013) .................................................. 41

*United States v. Zayyad*,
741 F.3d 452 (4th Cir. 2014) .................................................. 41, 44

**STATUTES**

18 U.S.C. § 3231 .................................................. 1

18 U.S.C. § 3553(a) .................................................. 37

28 U.S.C. § 1291 .................................................. 1

**RULES**

Fed. R. Evid. 401 .................................................. 43

Fed. R. Crim. P. 17(c) .................................................. 17, 38, 51, 52, 53

**SENTENCING GUIDELINE**

U.S.S.G. § 2B1.1 .................................................................. 34, 64, 65

## JURISDICTIONAL STATEMENT

Defendant Michael T. Rand appeals his conviction and sentence. The district court's subject-matter jurisdiction in this case is derived from 18 U.S.C. § 3231. This Court's appellate jurisdiction to review the appeal of Defendant's conviction and sentence is premised on 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Did the district court act within its discretion when it excluded evidence that Rand formerly had been falsely accused of deleting approximately 9,200 e-mails, when he only deleted approximately 6,700 e-mails?

2. Did the district court act within its discretion by declining Rand's request to subpoena voluminous accounting records from his former employer, by declining to permit Rand's accounting expert to summarize the work papers of outside auditors, and by admitting lay-opinion testimony of co-conspirators?

3. Did the district court plainly err when it declined to grant a mistrial based on the government's rebuttal closing argument?

4. Did the district court clearly err in its calculation of the loss reasonably foreseeable to Rand?

## STATEMENT OF THE CASE

### 1. Rand leads a "cookie jar" accounting scheme to defraud investors and the public.

Defendant Michael Rand served as Controller and then Chief Accounting Officer ("CAO") for Beazer Homes USA, Inc. ("Beazer") between 1999 and 2007. J.A. 1837, 1956. Beazer, a publicly traded company, was a large homebuilding company with divisions in numerous states. J.A. 1251-52, 1270, 1436, 2190. Rand held ultimate responsibility for the accounting function at Beazer and ensuring the reporting of accurate financial results to the SEC and investing public. J.A. 1258, 1264, 1956, 1959, 1962.

As Controller and then CAO, Rand regularly directed the division CFOs and others to fraudulently manipulate Beazer's reserve or contingency accounts, which existed so that the company could put money into reserve that related to the cost to complete certain homes or land development, as well as other anticipated expenses. J.A. 1258, 1275-76, 1432-34, 1480, 1517, 1527, 1672-73, 1675, 1741. Under the accounting rules (that Beazer told the public it was following), the amount put into a reserve account should be what the company

reasonably anticipates needing to meet the expected expense. J.A. 1259-60, 1434, 1512-13, 1742-43. It is not appropriate to increase or decrease funds in reserve accounts for the purpose of understating or inflating its actual earnings. J.A. 1249-50, 1261-62, 1287, 1289-90, 1304, 1436-37, 1451, 1742-43, 1847-49, 1865, 1868. Instead, if a company determines that it does not need funds in a reserve, those funds "are to be taken back as income as soon as [the company] know[s] they are no longer required." J.A. 1260-61.

Rand, however, directed certain employees to increase or decrease reserves and to make other adjustments in order to meet "consensus," or earnings targets. J.A. 1290-91, 1304, 1307-08, 1314-18, 1401, 1409-10, 1437-39, 1478-79, 1482, 1485, 1517, 1655-56, 1661, 1672, 1675, 1680, 1686-87, 1690, 1757, 1759-62, 1765, 1767-68, 1828, 1847-48, 1891-92, 1980-81, 2276, 2616; *see also* J.A. 1659, 1873, 1998-99. Rand was specific in his instructions to division executives to manipulate the accounting to reduce earnings when Beazer was beating consensus:

- "If you have more than 100k extra, hide it." J.A. 3179-21.
- "To achieve the 'goal' $ for this year, let's squirrel $ away in places which will turn around in the next year; not be so 'open.'" J.A. 3722.

- "To the extent there is excess profits, please anticipate this in advance and record additional contingencies in lot closings and/or be conservative in land allocations." J.A. 3723.

- "If we can squirrel in land allocations (which will close next year) and houses, that would be my preference." J.A. 1981-82.

- "[W]e may have $5 million to squirrel away, so if you have ant [Sic] ideas, let me know, . . . cookie jar has no more room…" J.A. 1982-83.

- "I would recommend . . . stashing some $ away in 3Q if closings come in as expected . . . ." J.A. 3751

- "Would you like an opportunity to stash away 100k till next quarter . . . ?" J.A. 3797

- "[O]nce we find a way to hide another $10 million . . . ." J.A. 3815

Beginning in 2000, Rand frequently directed George Trippe, CFO in the Virginia division, for example, to increase the house reserves "because the numbers were stronger than [the company] expected." J.A. 1292-93, 1295-96, 1298, 1307-08.

Rand also gave division CFOs and controllers earnings targets based on the Earnings Before Interest and Taxes, or "EBIT," that analysts expected or Beazer wanted to report. J.A. 1309, 1315, 1320, 1323-24, 1401, 1404-06, 1438, 1445-46, 1449, 1474-75, 1477, 1491, 1527, 1675, 1687, 1690, 1751-52, 1990, 1994. In early January 2002, for

example, Rand stated that he was giving the divisions their quarterly targets and that they should review their "land allocations, house contingencies" and not exceed the target for the quarter. J.A. 1315.

In the fall of 2005, when the housing market was in decline, Rand began instructing division executives to reduce reserves so that Beazer could continue to hit "consensus." J.A. 2175-81. For example, Rand instructed Richard O'Connor, the CFO in the Las Vegas division, to remove all contingencies, even from homes that ordinarily would have needed contingencies, resulting in increased income. J.A. 1529-30. In December 2005, Rand similarly instructed Bryan Schreiber, a regional CFO, to "[s]et aside time to scrub . . . accruals," noting that "[a] million may be the difference between missing and making consensus." J.A. 1656, 1863. Also in December 2005, Rand directed O'Connor to take reserves into income only to reverse that decision two days later. J.A. 1508-10. According to O'Connor, the reserves were ordered to be brought into income when it looked like "earnings were coming in too low," but when the earnings turned out to be "high enough," the funds were "reversed back out." J.A. 1509, 1523-25.

This practice of managing earnings is known as "cookie jar accounting" and resulted in a misrepresentation of Beazer's earnings in many quarters, including each quarter in fiscal year 2006. J.A. 1295, 1437, 1454-55, 1461, 1463, 1471-72, 1478-79, 1485, 1507-09, 1520, 1529-30, 1534, 1540, 1544, 1683-84, 1692, 1771, 1878-80, 1983, 2177, 2181, 2187. Rand was aware that this earnings manipulation was not permitted, directing Melissa Jones, the controller for the Phoenix division, to draft an "internal divisional policy" to account for accruing cost-to-complete reserves "so as not to look like we are managing earnings." J.A. 1685.

Deloitte & Touche ("Deloitte") served as Beazer's auditors. J.A. 1256, 2047-48. Rand provided or directed false reporting to Deloitte, directing O'Connor, for example, to provide a land allocation schedule that omitted "any cells with obvious comments indicating excess reserves." J.A. 1495, 3722-23, 3817-18.

### 2. Rand ignores accounting rules that prohibit the realization of profit from the sale of model homes if the builder has any continuing involvement in the homes.

In 2005, Beazer sought to enter into model-home sale/leaseback agreements. Under these sale/leaseback arrangements, Beazer would sell model homes to investors and rent the homes back from the investors until the subdivision was complete and the model home could be sold to a third-party buyer. J.A. 1966-67, 2053-55, 2088-89. Under the pertinent accounting rules, Beazer could not count the transaction as a sale and recognize revenue, unless "all risks and rewards of ownership" were transferred to the buyer. J.A. 2055-56. The seller could not have any "continuing involvement" with the property. J.A. 2056-57.

Rand consulted with Deloitte senior manager, Corbin Adams, about a potential sale/leaseback arrangement with GMAC. J.A. 2057, 2122. Beazer's objective was to record the transactions as sales and recognize the revenue. J.A. 2057-58. In December 2005, Rand sent Adams a draft Master Sale and Rental Agreement ("MSRA") that did not include any provision for Beazer to benefit from later appreciation in the value of the homes. J.A. 2064-65. Adams replied the next day that

based on that draft, the agreement "would qualify for accounting under a sale leaseback transaction" but that Deloitte needed a memorandum addressing the main issues, including "[n]o continuing involvement." J.A. 2065-66; *see also* J.A. 2129, 2132.

At the same time that Rand was telling Deloitte that Beazer was not sharing in the upside, he was assuring Beazer's employees that Beazer would share in the upside. J.A. 4089, 4145, 4151. On December 30, 2005, Rand signed the final MSRA on behalf of Beazer. J.A. 2068-69, 2144. On the same day that Beazer entered into the MSRA, a Property Management Agreement ("PMA") between GMAC entities was executed, and that agreement provided that Beazer would share in the upside of any consumer transactions. J.A. 2083-84. A few weeks later, Rand sent Adams a memorandum summarizing Beazer's "accounting position with respect to its transaction with GMAC." J.A. 2073. Rand represented to Adams that Beazer would not be able to "participate in appreciation of [the] leased assets." J.A. 2074, 2143. Based on these representations and the MSRA, Deloitte concluded that the transaction was appropriate for sale/leaseback accounting. J.A. 2076.

In the nine months after the first MSRA, Beazer entered into two more MSRAs, also followed by PMAs, all likewise agreeing that Beazer would share in appreciation upon the sale of the model homes. J.A. 2145, 2151-52. In August of 2006, Rand reaffirmed the side-deal in an e-mail to a division CFO, stating Beazer "significantly share[s] in the appreciation" of the model homes. J.A. 2147. Beazer received $117 million for these model-home sales and reported nearly $25 million in profit. J.A. 2089, 2165-66, 2168.

### 3. The FBI opens an investigation into Beazer's mortgage business; Rand deletes thousands of e-mails after learning of the grand jury's subpoena.

In March 2007, the FBI began investigating whether Beazer's mortgage company had engaged in mortgage fraud. J.A. 867-70. On March 23, 2007, a federal grand jury issued a subpoena that was served on Beazer's mortgage company in Charlotte, North Carolina, and required the retention of all documents, including e-mails, related to mortgages or the sales of homes by Beazer. J.A. 868, 3331-32, 881, 933. Four days later, *Businessweek* published an article quoting a spokesperson for the FBI confirming the investigation and stating that "there [were] all sorts of potential fraud issues" related to Beazer. J.A.

871-72, 936, 938. That same day, Beazer issued a press release announcing that it intended to cooperate fully with the government in its investigation. J.A. 939-40.

The next morning, on March 28, the FBI news "hit the national wires." J.A. 871-73. At 7:55 a.m., Rand forwarded an e-mail from Beazer's Chief Executive Officer ("CEO"), Ian McCarthy, to senior managers concerning the investigation. J.A. 944-45.

Also on March 28, Beazer put into place an "e-mail dumpster" designed to ensure that no e-mails relevant to the grand jury's investigation were permanently deleted. J.A. 973-74, 1178, 1230. Beginning March 29, all e-mails that a Beazer e-mail user attempted to delete were caught in this dumpster, unbeknownst to the employee. J.A. 1178, 1230.

At 2:58 p.m. on March 30, McCarthy sent a memorandum to Rand and other senior management, notifying them that Beazer was providing documents in response to the subpoena and would be providing an updated document-retention memorandum. J.A. 967-68. At 4:09 p.m., an in-house Beazer attorney, Deborah Danzig, sent an e-mail to all of the division presidents, attaching the updated document-retention

memorandum. J.A. 970-71. Ten minutes later, Danzig sent to the same memorandum to Rand and all of the employees in the Beazer corporate office. J.A. 971, 1034. This memorandum directed employees not to destroy any records, including e-mails. J.A. 972, 1035. Between 4:09 p.m. and 4:19 p.m., Danzig was reviewing her draft e-mail to corporate-office employees when Rand walked into her office and asked her what he was "required to retain." J.A. 974-75, 1005-06. Danzig replied that "he was required to keep everything and destroy nothing." J.A. 975-76.

Between March 29 and March 30, 2007, Rand deleted nearly 6,000 e-mails dating back to 1999. J.A. 1181, 1187, 1219. Between 3:09 and 3:10 p.m. on March 30, for example, Rand deleted 960 e-mails he had sent to Jimmy Yandle, CFO of Beazer Homes in Charlotte, between 1999 and 2004. J.A. 1182-85. Rand also deleted more than 200 e-mails from Beazer Mortgage CFO Lisa Trivers, as well as over 3,800 e-mails from Beazer Treasurer Cory Boydston. J.A. 1180-1204. Rand continued deleting e-mails until 4:26 p.m. J.A. 1205.

Some of the e-mails Rand deleted were directly responsive to the grand jury's subpoena and had evidence of mortgage fraud. J.A. 886-98.

For example, Rand deleted an e-mail from the CEO of Beazer Mortgage related to exceeding permissible incentive amounts and "not putting transactions on a HUD-1." J.A. 885-86. Other e-mails Rand deleted related to a federal program for individuals who have limited financial means and the adjustment of the sales price of homes to cover financing. J.A. 887-93.

Other e-mails that Rand deleted were related to the cookie-jar accounting scheme. These included an e-mail in which Yandle was told, for example, "If you have anything saved in the cookie jar, pull it out for this year's numbers." J.A. 901-902, 1210-11.

**4. Rand confesses to deleting e-mail messages and to improper accounting practices.**

Within 10 days after the grand jury issued its subpoena, Beazer's audit committee retained the law firm of Alston & Bird to conduct an internal investigation. J.A. 1064-65, 1096. Mike Brown, a partner with Alston & Bird, interviewed Rand as part of that investigation. J.A. 1065. Brown first interviewed Rand on June 15, 2007, nearly three months after the grand-jury subpoena was issued. J.A. 1065. By this time, Brown and his co-workers had "some concerns . . . about how

[Beazer was] maintaining [its] books and records and whether [it was] properly reporting or accurately reporting [its] earnings," based in part on e-mails that Brown had reviewed. J.A. 1066. During the interview, Rand gave Brown "some answers that . . . did not make sense" and after taking a short break, Brown asked Rand "whether or not he had destroyed or deleted any documents or emails since the investigation had begun." J.A. 1067-68. Rand replied that he had not. J.A. 1068.

Eleven days later, Brown met with Rand again, this time at Rand's attorney's office. J.A. 1070-71. As a result of the e-mail dumpster, Brown had learned that Rand had, in fact, attempted to delete thousands of e-mails after learning of the grand jury's investigation. J.A. 1070-71. Although Rand initially stated that he did not delete any e-mails, he eventually admitted that he might have deleted "a couple of emails" to reduce the size of his mailbox. J.A. 1072. As Brown questioned Rand more, Rand revised his answer and said that he deleted "a series of emails" from one particular co-worker on March 30. J.A. 1073. Beginning in July 2008, the FBI conducted a series of voluntary interviews with Rand. During these interviews, conducted by FBI Agent Douglas Curran and others, Rand admitted manipulating

Beazer's earnings, admitted that earnings manipulation was illegal, and expressed remorse. J.A. 2768, 2778. Rand told Curran that he usually began by manipulating the corporate-level accounts but that if he could not meet the earnings targets with those adjustments only, he would "go . . . down to the division level" and use the reserve accounts. J.A. 2775. Curran also asked Rand about the GMAC transaction, and Rand admitted that there was a "verbal side agreement to share in the appreciation of the model homes when they were ultimately sold." J.A. 2780.

Finally, Curran asked Rand about e-mail deletions, and Rand admitted that "he was certain that by March 27th he was . . . aware that there was a federal investigation in Charlotte." J.A. 2783. Rand also admitted that he had spoken with Danzig and understood that the document-retention memorandum applied to him, when he "went back to his office and started performing mass deletions of emails." J.A. 2784-85. Explaining why he deleted the e-mails, Rand stated that "[t]here were a lot of stressful events going on in his life at that time, and on top of that he was aware of the federal grand jury investigation that was focused in Charlotte and he did not want to be associated with that

investigation in any way." J.A. 2785-86. Rand admitted that he "understood that he was deleting evidence pertinent to the investigation" and "[h]e knew it was wrong." J.A. 2786.

### 5. Rand is convicted by a jury of conspiracy and obstruction-of-justice offenses.

A federal grand jury indicted Rand and charged him with conspiracy, securities-fraud, and obstruction-of-justice offenses. J.A. 69-83. Related to the obstruction-of-justice counts, the grand jury alleged that "[f]rom on or about March 23, 2007, through about 4:22 p.m. on or about March 30, 2007, Rand deleted and attempted to delete e-mail messages from his Beazer e-mail account." J.A. 65. The grand jury alleged "[m]ore specifically" that "Rand deleted and attempted to delete approximately 4,200 e-mails from his Beazer e-mail account between 3:07 p.m. and 4:22 p.m. on or about March 30, 2007. J.A. 65.

#### a. <u>Rand's case is tried by a jury who hears evidence that Rand deleted more than 3,000 e-mails between March 23 and March 28, 2007, and approximately 6,000 e-mails on March 30, 2007.</u>

Rand was tried twice. In the first trial, beginning October 11, 2011, Rand's case was tried before a jury, the Honorable Robert J. Conrad, Jr., presiding. During this trial, the government presented evidence of

e-mails that were pertinent to the grand jury's investigation into Beazer's mortgage division and that Rand deleted from his Beazer e-mail account. J.A. 103-04, 335-36. Government witnesses testified that some of these e-mails were deleted between March 23 and 28, while others were deleted on March 30, after the e-mail dumpster was put into place. *See*, *e.g.*, J.A. 103-04, 107-12, 475-76.

As part of its evidence on the obstruction-of-justice counts, the government presented the testimony of Aaron Phillipp, a computer forensics expert who was hired by Beazer to examine certain of Beazer's backup tapes and e-mail dumpster and determine whether and to what extent Rand had deleted e-mails pertinent to the grand jury's investigation. J.A. 172-75. Phillipp testified first about the e-mails that were found in "the Mike Rand mailbox dumpster." J.A. 175-76, 179. According to Phillipp, Rand deleted a total of 5,936 e-mails between March 29 and March 30, 2007. J.A. 181-85, 211. Phillipp also testified that he had analyzed Beazer backup tapes from March 23 and March 30, 2007, and that a comparison between those tapes revealed that between March 23, 2007, and when the e-mail dumpster was put into place on March 28, 2007, 3,272 e-mails had been removed from

Rand's mailbox. J.A. 195, 198, 211, 223; *see also* J.A. 338-39. Phillipp was vigorously cross-examined by Rand, who presented e-mails Rand had found on an April 2007 "snapshot" it had obtained from Beazer, but which were among the e-mails Phillipp testified he had concluded were deleted based on the backup-tape comparison. J.A. 242-43, 249-51, 257.

After two-and-a-half days of deliberation, the jury found Rand guilty on seven counts and acquitted him on four counts. J.A. 574-75. The district court later vacated Rand's convictions and ordered a new jury trial based on juror misconduct. *United States v. Rand*, 2013 WL 4782607 (W.D.N.C. 2013).

b. The district court denies Rand's motion to subpoena voluminous Beazer accounting records.

Prior to the second trial, Rand filed a motion for a subpoena under Federal Rule of Criminal Procedure 17(c), requiring that Beazer produce all its records from fiscal years 1999 to 2007 related to (1) house cost-to-complete contingency reserves; (2) manual cost-to-complete reserves; (3) warranty reserves or "reserve close out" accounts; (4) land, land inventory, and land development accounts; (5) water tap fees; (6) model center allocations; and (7) moisture warranty exposure reserves.

WDNC 3:10cr182, Doc. 215. In response, the government noted that Rand sought entries that were unrelated to the accounting entries the government relied upon to prove Rand's manipulation of Beazer earnings and that were not in the government's possession. The government argued these voluminous records would at most "point the jury to lawful or appropriate accounting transactions not at issue," and were not necessary to place the accounting entries relied upon by the government into context. *Id.*, Doc. 219 at 1.

Rand's motion was referred to a magistrate judge who denied it. Applying the test Rand argued controlled— the test articulated by the Supreme Court in *United States v. Nixon*, 418 U.S. 638 (1974)—the magistrate judge found that Rand's motion requested access to potentially millions of entries in Beazer's accounting system over an eight-year period and that Rand had "cast a very wide net while failing to show that [the information sought was] evidentiary or relevant." *Id.*, Doc. 228 at 2.

Rand objected to the magistrate judge's order, and the district court denied Rand's objections. The district court found that Rand had not established that each of the records subpoenaed was evidentiary and

relevant, that he could not properly prepare for trial without such production, or that his intent was not to conduct a general fishing expedition. The court noted that "[e]ven after seeing the government's evidence at the first trial [Rand had] not tailored his request to the entries, accounts, locations, and dates actually at issue." *Id.*

c. <u>The district court permits the government to elicit testimony from lay witnesses that certain accounting practices were improper.</u>

Also prior to the second trial, Rand filed a motion in limine to preclude the government from eliciting opinion testimony from lay witnesses that certain accounting practices that Rand directed them to engage in were "improper" or "wrong." Addressing Rand's motion during a pretrial hearing, the district court found that lay-opinion testimony about whether the witnesses' own conduct, engaged in with Rand, was proper and admissible but stated that it would require that the witnesses characterize their conduct as, at most, "improper," rather than using more "inflammatory terms," such as "fraudulent" or "lies." J.A. 695-96.

Later in that pretrial hearing, the district court addressed the government's motion to admit statements made by Rand after he entered

into a proffer agreement with the government. J.A. 702. Although the district court recognized that these statements would be admissible if the evidence established that Rand had materially breached the proffer agreement, the court denied the government's motion to admit those statements during its case in chief. J.A. 702-03. The court noted, however, that it would "reconsider the ruling in light of the evidence should the court become convinced as a result of the evidence or cross examination aimed at creating an inference that differ[ed] from statements in the proffer agreement." J.A. 703.

d. <u>The district court denies Rand's motion to present evidence that he was previously accused of deleting e-mails that he did not, in fact, delete.</u>

Also prior to the second trial, Rand sought and was issued a subpoena requiring the production of Beazer's backup computer tape from March 30, 2007. J.A. 718-19. Rand's expert examined the data contained on the tape and concluded that approximately 2,500 of the approximately 3,200 e-mails that Phillipp testified during the first trial were deleted between March 23 and March 28, 2007 (prior to the dumpster being in place), were not, in fact, deleted, explaining that

"there [were] various technical explanations why Mr. Philipp could not find them on the tape the first time." J.A. 719.

A few days later, the government filed a motion to strike two paragraphs of the indictment. The government noted that Rand's expert agreed that Rand had deleted approximately 800 e-mails between March 23 and March 28, 2007, but because this number was substantially fewer than the government originally believed were deleted, the government "ha[d] elected to proceed only on the undisputed evidence of [Rand's] deletions in the e-mail dumpster." WDNC 3:10cr182, Doc. 330 at 1.

Rand objected, arguing that the indictment could not be amended if it was going to cause prejudice and that "there [were] many more paragraphs than just those two that need[ed] to be revised." J.A. 744. Rand specifically objected to a paragraph in the indictment describing Rand's interview with Brown on June 26, 2007, and the resumption of that interview after Brown learned that Rand had allegedly deleted thousands of e-mails between March 23 and 28. J.A. 745-47. In response, the prosecutor stated that in addition to the evidence of the 800 e-mails that both parties agreed Rand deleted between March 23

and 28, the government was self-suppressing the evidence of the second half of the interview on June 26, notwithstanding evidence that the second half of the interview was also based upon the dumpster deletions. J.A. 751-52.

The district court declined to dismiss any counts of the indictment but noted that Rand could move at the close of the government's case to dismiss any counts that the government had failed to prove. J.A. 752. The government then moved the court to preclude Rand from attacking the government's former position that he had deleted thousands of e-mails between March 23 and 28, explaining that this evidence was "no longer relevant and [would] no longer be part of the trial." J.A. 752. Rand objected, arguing that preventing him from putting on evidence of the former allegations of e-mail deletions that the government was no longer relying on would "cause the defense significant prejudice." J.A. 753. In particular, Rand argued that excluding evidence of the former allegations would hinder his cross examination of Brown and the evidence that he was falsely accused was also evidence of his "state of mind during the proffer sessions." J.A. 754.

The prosecutor responded that Rand would be able to argue to the jury that he did not delete any e-mails before the e-mail dumpster was put into place and that the government would not have a response to that because it was self-suppressing the evidence of the approximately 800 e-mails that he deleted prior to the dumpster being in place. J.A. 757. Addressing Rand's state of mind during the proffer session, the prosecutor noted that Rand could assert that he lied to the government because the government said he deleted e-mails and he had only deleted a subset of those e-mails, and the government would not object to that testimony. J.A. 758. But, the prosecutor noted that Rand was correctly accused during that proffer session of deleting thousands of e-mails. J.A. 758. Concerning Rand's cross examination of Brown, the prosecutor argued that this line of cross examination should be excluded under Federal Rule of Evidence 403, because the government would not be asking Brown about that portion of his interview with Rand. J.A. 759. Responding to Rand's arguments related to the dismissal of the obstruction counts, the prosecutor noted that there was "no doubt" that Rand deleted almost 6,000 e-mails on March 29 and 30. J.A. 777.

The district court denied Rand's motion to dismiss the obstruction counts, explaining that "the second trial [was] on a completely different footing in light of the self-suppression by the government" and that the court did "not see any knowing or deliberate misconduct by the government." J.A. 779-80. The district court stated that the government's decision to self-suppress evidence of 800 e-mails that were deleted between March 23 and 28 was "beyond what would be required" and was an adequate remedy. J.A. 780. The court concluded that "in light of the government's narrowing of charges, . . . evidence or argument concerning the backup tape emails that are no longer in the case would be irrelevant" and that "to the extent some slight or marginal relevance [was] established . . . , . . . it would be outweighed by [Federal Rule of Evidence] 403 concerns of distracting [and] confusing the jury." J.A. 780-81. The district court stated that it had "listened carefully to the proffer of relevance with respect to Mr. Brown's credibility, Beazer's credibility, Mr. Rand's state of mind, the taint of witnesses . . . and . . . the issue of termination based upon false accusations of email deletion" but that it did not find that "evidence or argument about suppressed

backup tape evidence [was] relevant" and any "slight relevance" was "substantially outweighed by the potential for jury confusion." J.A. 781.

e. <u>The district court admits Rand's accounting-expert testimony on the propriety of accounting entries but excludes evidence of auditor work papers.</u>

In response to the government's motion to exclude certain expert testimony, the district court denied the motion and held most defense-expert testimony would be admissible. Addressing, first, Rand's request that his accounting expert be permitted to testify to the accuracy of Beazer's records and the propriety of Rand's accounting decisions, the district court found that this testimony would be admissible. J.A. 2008-09. The district court declined, however, to permit Rand's expert to testify about Deloitte work papers, noting that it was "not relevant what Deloitte & Touche opined at the time." J.A. 2010. The district court stated that Rand's expert was free to "render his own opinion as to the propriety of the transactions" but testimony from an outside expert about the Deloitte contemporaneous opinion "would be confusing to the jury, to the extent [it was] relevant at all." J.A. 2010. Later during the trial, the district court reaffirmed its decision to exclude any testimony from Rand's expert about the Deloitte

work papers, noting that Corbin Adams, the auditor who had testified, had "walked away from those work papers, [saying] that he was not provided sufficient information." J.A. 2475. The court explained that Rand's expert could provide an opinion as to the legitimacy of accounting entries made at Rand's direction, but that he could not "bootstrap that opinion by the Deloitte and Touche work papers which the court ha[d] found [were] not reliable." J.A. 2480.

f. At the conclusion of the second jury trial, Rand is convicted on all counts.

Rand's case was tried for a second time before a jury. Prior to trial the government dismissed the securities-fraud count and the document-destruction count, noting that these dismissals would leave the § 371-conspiracy count, the wire-fraud conspiracy count, and three counts related to obstruction of justice. J.A. 727-28.

i. Rand's former colleagues are permitted to testify to transactions in which they participated that they believed were inappropriate.

At trial, the government presented the testimony of current and former Beazer executives. J.A. 1250, 1267-68, 1430-31, 1738, 1835-36. Many of these witnesses testified that they, at Rand's direction, had

made or directed accounting entries that were not proper. J.A. 1304, 1325-26, 1437-38, 1441, 1492-93, 1518, 1541-42, 1547, 1672, 1676-77, 1686, 1695, 1744, 1757, 1760-61, 1767-68, 1772. These witnesses also testified about their understanding of well-established accounting practices and terms. J.A. 1287, 1437, 1693-94, 1742-43.

ii. <u>Rand presents his defense.</u>

Rand presented several witnesses, including four experts. Rand's first expert, Anna Shelton, testified that Rand deleted almost 6,000 e-mails between March 29 and 30, 2007. J.A. 2376. Shelton testified about Rand's computer activity on March 30, 2007, and concluded that Rand opened Danzig's e-mail with the updated document-retention memorandum at 4:25 p.m. that day. J.A. 2346.

Rand's accounting expert, Todd Bailey, testified that each of the accounting entries the government challenged was reasonable and proper, including the accounting treatment of the sale/leaseback transaction with GMAC. J.A. 2490-91, 2517, 2519, 2521. Responding to the testimony of Rand's colleagues who felt compelled to make accounting entries they believed were improper, Baily testified that he considered those accounting entries in the context of the entire company,

rather than from the perspective of a particular division. J.A. 2495-96, 2538-39. Bailey also testified that the accounting entries he reviewed were not consistent with a cookie-jar accounting scheme. J.A. 2499.

iii. On rebuttal, the government introduces evidence of Rand's confession.

Prior to the government's rebuttal case, the district court considered the admissibility of Rand's statements made after he entered into the proffer agreement with the government. J.A. 2657. The court specifically addressed whether Rand's statements were admissible under the third exception to the prohibition against using those statements against him, which provided that the statements may be used in a criminal proceeding for purposes of impeachment, rebuttal, or countering a defense. J.A. 2657. The court found that "with respect to the key issues in the case, [including] the business legitimacy of the reserve accounting, the legitimacy of the GMAC transaction, and the deletions of emails, . . . the alleged admissions by [Rand] in the proffered sessions [were] directly contrary to the defense presented" through opening statement, examination of witnesses, and expert testimony. J.A. 2657-58. The court found, therefore, that the statements could be

admitted consistent with the parties' proffer agreement. J.A. 2658. The court also found that the probative value of the evidence, which the court characterized as "strong," was not substantially outweighed by any Rule 403 factors. J.A. 2658.

Following this ruling, Rand again requested permission to testify that he was falsely accused of e-mail deletions before he gave his statements in accordance with the parties' proffer agreement. J.A. 2658. Rand noted that at a reverse-proffer session before he made his statements, the government used a powerpoint presentation that included the claim that he had deleted e-mails between March 23 and March 28, 2007. J.A. 2659.

In response, the prosecutor explained that the powerpoint presentation that the government made to Rand before he gave his confession was 78 pages long and that only five pages included examples of deleted e-mails. J.A. 2661. Two of the five pages referred to e-mails that had been deleted, while three of those five pages referred to e-mails that had not been deleted. J.A. 2661. The prosecutor noted that during the proffer sessions with Rand he was never asked why he had

deleted specific e-mails and was asked, instead, if he had deleted e-mails at all. J.A. 2662.

The district court declined to permit Rand to testify that he was formerly accused of deleting e-mails. The district court found that Rand could explain what had induced him to speak with Curran "without reference to the fact that years later some of the information that he was confronted with turned out to be false." J.A. 2664. The district court stated further that Rand "could truthfully respond to what was in his mind at the time." J.A. 2664. But, the court would not permit "testimony as to the ultimate . . . reality of whether the government did in fact have that evidence" because "that ha[d] nothing to do with his state of mind at the time he [made] the statements." J.A. 2665-66.

In its rebuttal case, the government presented the testimony of FBI Agent Douglas Curran. J.A. 2760. Curran testified that in asking about e-mail deletions, the agents "focused in on Friday, March 30th." J.A. 2784. Rand was given the opportunity to present a sur-rebuttal case but declined.

iv. Both parties refer to gold in their closing arguments.

During Rand's closing, his counsel argued that the fact that Rand did not delete any e-mails until March 29 or 30 weighed against any finding that Rand obstructed justice. J.A. 3002. Specifically, Rand's counsel argued that the fact that Rand was joking about the investigation into Beazer but did not delete any e-mails until March 29 or 30 was proof that there was no intent to obstruct: "[I]f he was so obsessed, one would have expected him to start deleting immediately after receiving the grand jury subpoena on March 23rd. But instead he does nothing whatsoever until March 30th." J.A. 3002.

At the conclusion of Rand's closing, counsel invoked the story of the Emperor With No Clothes, noting that in the story the weaver offered to make the emperor an invisible suit of clothes in exchange for a bag of gold. J.A. 3008-09. Rand's counsel argued that the government's case was similar to the invisible suit of clothes. J.A. 3009.

The government began its rebuttal argument where Rand left off, with the story of the Emperor With No Clothes, stating that the jury "just heard a story all right" and that "[i]t took a lot of gold," referring to

Rand's experts. J.A. 3010. The prosecutor then addressed some of Rand's other arguments, beginning with Rand's assertions that he had lied to the FBI because he was desperate and that Curran had made up his confession. J.A. 3010-11. The prosecutor noted that Rand gave his statements in the presence of his lawyers, representatives from the SEC and the United States Attorney's Office, as well as Curran, and that Curran was risking perjury, the loss of his career, or even jail if he made Rand's statements up. J.A. 3011. Rand objected to this argument, asserting that it was improper vouching, and the district court sustained Rand's objection. J.A. 3011.

Addressing Rand's argument that he lied because he was desperate, the prosecutor questioned why Rand was desperate and noted that Rand's counsel could not explain it "because your lawyer can't talk about your own beliefs, they can just make arguments." J.A. 3012. Asking again why Rand was so desperate that he needed to lie, the prosecutor noted that Rand's wife testified that he did not need money and that money was not important to him, asking, "What was he so desperate about, he was rich?" J.A. 3012. The prosecutor concluded the government's closing argument by suggesting to the jury that they

could "go live in a story like the Emperor With No Clothes and listen to the story that was bought with gold, or [the jury] [could] look at the facts." J.A. 3023.

When court reconvened more than an hour after these arguments concluded, Rand moved for a mistrial, arguing that the government's rebuttal argument improperly appealed to class prejudice and improperly commented on Rand's right not to testify. J.A. 3028-29. In response, the prosecutor stated that his rebuttal closing argument was "extremely responsive to [Rand's counsel's] closing argument," that the gold metaphor was Rand's, and that Rand's counsel argued that Rand had no motive to commit the crime because money was not important to him. J.A. 3030.

After hearing further argument, the district court denied Rand's motion for a mistrial. J.A. 3031-32. The district court stated that it did not think that the government's rebuttal closing argument was a class-prejudice argument and that it was, instead, responsive to the motive argument in Rand's closing argument. J.A. 3032. The district court also stated that it did not understand the government's argument to be a comment on Rand's decision not to testify. J.A. 3032. After

approximately five hours of deliberations, the jury found Rand guilty of each of the charged offenses. J.A. 3085-86.

### 6. The district court sentences Rand to a downward-variance sentence of 120 months in prison.

In Rand's presentence report ("PSR"), the probation officer calculated a total offense level of 43 and an advisory guideline range of life based, in part, on the finding that the loss reasonably foreseeable to Defendant was between $100 and $200 million. S.J.A. 25, 27-28. Rand objected to this loss calculation, and the district court conducted a full-day sentencing hearing. During the hearing, both parties presented expert testimony on the appropriate calculation of loss under Sentencing Guidelines § 2B1.1 and, in particular, the effect on the value of Beazer's stock of three separate announcements Beazer made to the market related to Rand's offense conduct. J.A. 3114.

The first relevant announcement was a Form 8-K that Beazer filed with the SEC on June 27, 2007, which announced, in part, that Rand had been terminated for cause "stemming from attempts to destroy documents in violation of the Company's document retention policy." J.A. 3136, 4623-24. The second relevant announcement was issued on

August 10, 2007, when Beazer announced that Defendant may have engaged in cookie-jar accounting, which may have caused reserves to have been recorded in excessive amounts, which, if reversed in later accounting periods, could have reduced inappropriately Beazer's operating expenses. J.A. 4625-27. Finally, on October 11, 2007, Beazer issued the third announcement, revealing that based on its investigation into Rand's misconduct, it would be necessary to restate its consolidated financial statements relating to fiscal years 2004 through 2007. J.A. 4607.

Sanjay Unni, Rand's expert, testified that the only announcement that could reasonably have impacted the value of Beazer's stock was the October announcement, because that was when "the market learned about the actual accounting implications of the reserve adjustments." J.A. 3115, 3213. Unni testified that the October disclosure did not have "a statistically significant impact on [Beazer's] stock price and concluded that "there was no identifiable loss caused by Mr. Rand's conduct." J.A. 3114, 3128-29.

The government's expert, Edward O'Neal, disagreed with Unni's assessment. O'Neal explained that it did not make sense to use only the

October 11 announcement in analyzing the economic loss caused by Rand's misconduct, because the information disclosed in that announcement had already been disclosed to the market in the June and August announcements and compounded into the stock price following those earlier announcements. J.A. 3238-42; 4605-08. Analyzing the impact on Beazer's stock price following the June and August announcements and using the "more economically sound" and widely-accepted Standard Model for assessing economic impact, O'Neal determined that the loss resulting from Rand's conduct was $250.8 million. J.A. 3224-29, 3232. Using a more conservative baseline, O'Neal determined that the loss was $135 million. J.A. 3229-32. O'Neal opined that using the methodology set forth in the Sentencing Guidelines would result in losses following the June and August announcements ranging from $505 million to $1.9 billion. J.A. 3232-39.

After considering this testimony and hearing argument, the district court determined that the announcements Beazer made to the market in June and August were the "proper announcements to consider in terms of loss" because "the market had already impounded the news of the first disclosure announcements in June and August, making the

October 11th reaction of less value in determining the ultimate loss in the case." J.A. 3278-81. The district court also found that "using [the] October 11 [announcement] unduly narrow[ed] the focus of the loss with respect to Mr. Rand's conduct to the accounting fraud" and ignored the obstructive conduct that was the subject of the June announcement. J.A. 3280. The district court adopted O'Neal's most "conservative methodology" and found a loss of $135 million. J.A. 3281. Based upon that finding, the district court calculated the total offense level of 51, resulting in an adjusted offense level of 43 and an advisory guideline sentence of life. J.A. 3285. After considering the appropriate sentence under 18 U.S.C. § 3553(a), the district court sentenced Rand to 120 months in prison. J.A. 3306.

## SUMMARY OF THE ARGUMENT

I. The district court acted within its discretion by excluding evidence that Rand was initially accused of deleting more e-mails between March 23 and 28, 2007, than he actually deleted. The government did not offer any evidence that Rand deleted any e-mails during this time period in proving its case to the jury, notwithstanding the undisputed evidence that Rand, in fact, deleted approximately 800

e-mails between March 23 and 28. Brown and the Beazer witnesses would not have been wrong in concluding that Rand improperly deleted e-mails during this time period, therefore, and the previous allegations of particular e-mail deletions constituted such a minor part of the government's reverse proffer that Rand's argument that his defense was gutted when he was not permitted to argue that these allegations prompted him to confess *and* were false falls flat. Rand was permitted to testify about the reasons he confessed and what he understood at the time he made his statements, and the defense was free to argue that the government did not prove Rand deleted any e-mails before March 29, 2007. The district court reasonably concluded that a difference in the degree of Rand's wrongdoing was not relevant and would only serve to confuse the jury.

II. The district court also acted within its discretion by denying Rand's motion for a Rule 17(c) subpoena, by prohibiting Rand's accounting expert from summarizing auditor work papers that the district court found were unreliable, and by admitting lay-opinion testimony from co-conspirators based on personal experience. The subpoena was anything but narrowly tailored to require the production

only of admissible and relevant evidence, and under either *Nixon* or the more lenient standard Rand argues should have applied, the district court properly denied Rand's motion. The district court reasonably concluded that permitting Rand's accounting expert to testify about Deloitte work papers would have resulted in the admission of hearsay evidence that was not reliable in light of the evidence that the information Rand provided to Deloitte was incomplete or misleading. Finally, the district court acted within its discretion by admitting the testimony of Rand's former Beazer colleagues and co-conspirators that accounting entries they made or directed were "improper."

III. The district court did not plainly err in denying Rand's motion for a mistrial based on isolated remarks made by the prosecutor during the rebuttal closing argument. The district court reasonably concluded that the prosecutor's reference to the gold that was required for Rand to tell his story referred to the fact that Rand's case was built on compensated experts, not to Rand's personal wealth. The district court also properly rejected Rand's assertion that the prosecutor commented on Rand's failure to testify, where the context of the statement makes clear that the prosecutor was referring to the failure of Rand's counsel to

answer a question raised by the evidence. Rand has not identified any improper remarks, nor has he identified remarks that could reasonably be found to have denied him a fair trial.

IV. The district court did not clearly err in finding that Rand's fraudulent and obstructive misdeeds caused a loss of more than $100 million. The government's expert testified that using the method suggested by the guideline commentary, a loss of at least $451 million was reasonably foreseeable to Rand. Rand does not challenge this calculation, and based on that testimony alone, the district court's finding of a loss of more than $100 million is not clear error.

## ARGUMENT

### I. The district court acted within its discretion by permitting Rand to explain why he confessed but declining to permit him to present evidence that he formerly had been accused of deleting certain e-mails.

#### A. Standard of Review

While "[t]his Court reviews evidentiary rulings implicating constitutional claims de novo," *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011), "the crux of [Rand's] complaint is that he was not allowed to present a particular defense," *see United States v. Malloy*, 568

F.3d 166, 177 (4th Cir. 2009). Accordingly, Rand's argument "is better framed as an evidentiary argument." *See id.*

"District courts generally enjoy broad discretion in ruling on the admissibility of evidence, as well as in the realm of trial management," *United States v. Woods*, 710 F.3d 195, 200 (4th Cir. 2013) (internal citations and quotations omitted). A district court's decision as to relevance is "rarely reverse[d] … because [such decisions] are fundamentally a matter of trial management." *See United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014) (internal quotations and citations omitted). Additionally, Rule 403 rulings "will not be overturned except under the most extraordinary circumstances." *See id*. Further, evidentiary rulings, such as the district court's ruling here, are reviewed for an abuse of discretion, which the Court "will not find unless the decision was 'arbitrary and irrational.'" *United States v. Blake*, 571 F.3d 331, 346 (4th Cir. 2009). And, even if an abuse of discretion is found, the ruling is subject to harmless-error review, whether the claim is of constitutional dimension or not. *Williams*, 632 F.3d at 132.

## B. Discussion

Rand's argument that the district court violated his constitutional right to present a defense by excluding evidence that Rand was, at one time, incorrectly accused of deleting certain e-mails is meritless. As this Court has recognized, "a defendant's right to present a defense is not absolute: criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial." *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003). After presiding over Rand's first trial and hearing extensive argument from Rand about why he should be able to present evidence that he formerly had been falsely accused of deleting certain e-mails, the district court reasonably concluded that this evidence was not relevant and that any probative value of the evidence was outweighed by the danger that the evidence would serve more to confuse the jury than to inform the jury.

First, it is undisputed that Rand, in fact, deleted approximately 800 e-mails between March 23 and 28, 2007, and nearly 6,000 e-mails between March 29 and 30. While the government learned shortly before Rand's second trial that he had not deleted as many e-mails between March 23 and 28 as the government had asserted during Rand's first

trial, the accusation that he engaged in a large-scale effort to delete e-mails between March 23 and 28 is not, and never was, false. Second, the government did not present any evidence of any e-mail deletions between March 23 and 28 in Rand's second trial, nor did the government present any evidence of the second half of Brown's June 26 interview with Rand, which Rand asserted related to the earlier deletions. Third, it is undisputed that the government was not aware at the time it presented its reverse proffer to Rand or at the time of Rand's first trial that his March 23-28 e-mail deletions were fewer in number than the government originally believed.

In light of the fact that the assertion that Rand deleted numerous e-mails between March 23 and 28 is true and in light of the government's decision not to present any evidence that Rand deleted e-mails before March 29, the district court reasonably concluded that the evidence that Rand was earlier accused of having deleted more e-mails than he actually deleted did not have "any tendency to make a fact more or less probable than it would [have been] without the evidence" and that, even if the excluded evidence would have been probative, it was not probative of a "fact . . . of consequence in determining the action." Fed. R. Evid.

401; *Zayyad*, 741 F.3d at 459. Additionally, the district court did not act arbitrarily or capriciously in excluding the evidence under Rule 403 on the basis that even if this evidence had some probative value, its probative value was outweighed by the danger that the jury, having never heard any evidence of March 23-28 e-mail deletions, would be confused by evidence that Rand had earlier been accused of making these deletions.

In challenging the district court's decision, Rand has not identified any fact that the jury was required to determine that was more or less likely to be true simply because the government initially understood the extent of his earlier e-mail deletions to be greater than it actually was. Instead, Rand asserts that the exclusion of the evidence prevented him from using the evidence in three particular ways that prejudiced him. These arguments fail.

Rand first argues that the evidence was necessary to explain why he confessed to Curran that he had engaged in improper accounting practices and that he had deleted e-mails in the wake of the issuance of the grand-jury subpoena that he knew might be relevant to the investigation. Specifically, Rand argues that the jury "never learned

that, prior to Rand's statements, the prosecution told Rand that it had state-of-the-art forensic proof that Rand began deleting emails on March 23, shortly after the grand jury subpoena, and that he continued to delete thousands of e-mails throughout the following week." Def. Br. at 28. According to Rand, he was prepared to testify that he spoke to the prosecution "only under the heavy weight of those false accusations." Def. Br. at 29.

It is undisputed, however, that the government, in fact, had forensic proof that Rand began deleting e-mails shortly after learning of the grand jury's subpoena and that he deleted thousands of e-mails during the next week—nearly 7,000 e-mails including the 800 e-mails he deleted between March 23 and 28. Additionally, of the 78-slide powerpoint presentation made to Rand during the government's reverse proffer, only the final seven slides addressed e-mail deletions and only five of those slides included specific examples, two of which were e-mails that he agrees were deleted. *See* S.J.A. 155-61. Only four of 78 slides contained any incorrect information at all, and three of those slides were simply examples of obstructive behavior that Rand, in fact, engaged in. The vast majority of the specific "accusations" made by the government

during its reverse proffer were, therefore, true, and the more general assertion that Rand engaged in mass e-mail deletions in the week after the issuance of the subpoena was entirely true. That a small fraction of the specific accusations were not true is not probative of any fact of consequence, where the only "accusations" of consequence were factually correct.

Additionally, the district court reasonably concluded that permitting Rand to present evidence that he improperly deleted only 25% of the e-mails he was originally accused of deleting between March 23 and 28 presented the danger of jury confusion. The government did not present any evidence of March 23-28 deletions, and had Rand's proffered evidence been admitted, the jury may well have been left confused, wondering why evidence that Rand deleted a significant portion but not nearly all of the e-mails he was originally believed to have deleted during that time period mattered to their decision, when the government had not presented any evidence of deletions between March 23 and 28.

Rand's argument also fails because the district court's evidentiary ruling did not prevent him from explaining why he confessed. As the

district court made clear in its ruling, Rand was free to explain to the jury any duress he felt as a result of the government's reverse proffer. Rand was also free to assert his innocence of any and all accusations that he believed were falsely made. Nothing about the district court's ruling precluded Rand from testifying about his reasons for confession or from testifying that his confession was false. The district court simply, and reasonably, concluded that what happened in the first trial and in between trials could not have had any bearing on Rand's state of mind at the time he confessed.

Rand's reliance on *Crane v. Kentucky*, 476 U.S. 683 (1986), to support his argument that he was deprived of the opportunity to tell the jury the circumstances of his confession is misplaced. In *Crane*, the defendant argued that his confession was coerced, and the district court excluded all evidence of the circumstances surrounding the defendant's confession, including the interrogation techniques employed by investigating law-enforcement officers. *Id.* at 685-86. The Supreme Court reversed, holding that defendants have a constitutional right to present evidence about the manner in which a confession was obtained. *Id.* at 691.

This case is distinguishable from *Crane*, because the district court made clear that Rand at all times retained the right to describe the circumstances surrounding his confession, including his state of mind at the time he learned of the government's evidence against him and whether he understood that evidence to be true or false. Unlike the defendant in *Crane*, Rand has never asserted that his will was overborne by deliberately coercive, badgering law-enforcement officers after protracted questioning in harsh conditions. *See id.* at 685. Nor has Rand made any accusations that come close to the level of the coercion alleged in *Crane*. The undisputed evidence in this case is that Curran was not even present for the reverse proffer, Curran never asked Rand specifically about any e-mails, and Curran focused the questioning on Rand's e-mail deletions on March 30. The district court's decision to permit Rand to testify to the "accusations" the government made during its reverse proffer and how that reverse proffer impacted Rand's decision to confess was reasonable and in accord with *Crane*.

Rand also asserts that the district court's exclusion of this evidence improperly hindered his cross examination of Brown and Beazer witnesses. Rand argues that the jury might have acquitted him of

misleading Brown and hindering a grand-jury investigation on June 26 had they known that Rand had truthfully denied having made *some* e-mail deletions. This argument ignores the fact that Brown only testified to questioning Rand about March 30 e-mail deletions, and those e-mail deletions unquestionably occurred. This argument also ignores the fact that Rand, in fact, deleted many e-mails between March 23 and 28. Brown's credibility could not reasonably be challenged based on his questioning Rand about e-mail deletions that he understood to be accurate at the time. Additionally, permitting this questioning would have served, as the district court feared, only to confuse a jury that never heard evidence of the March23-28 deletions.

Likewise, the district court properly declined to permit Rand to question his former co-workers about whether they knew he had been falsely accused of deleting certain e-mails. Rand asserts that "[i]t is possible, if not likely, that those witnesses testified under the mistaken impression Rand had engaged in mass-email deletion the week following the grand jury subpoena." Def. Br. at 34. But, that is exactly what Rand did, and his former co-workers would not have been mistaken if that was their impression. Additionally, Rand was permitted to

cross-examine the witnesses at length about the fact that they read the first trial transcript. *See* J.A. 1039-44, 1443-44, 1640-42.

Even if the district court erred in declining to permit Rand to present evidence that he was falsely accused of deleting certain e-mails between March 23 and 28, any error was harmless because this Court can say, with fair assurance, that the result would not have been any different. *See United States v. Briley*, 70 F.3d 267, 278 (4th Cir. 2014) (an error is harmless if the court can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," that the jury's consideration was not "substantially swayed" by the error (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). The jury was not asked to make any finding of fact related to e-mail deletions between March 23 and 28, the government presented no evidence of any e-mail deletions during that time period, and the government's evidence that Rand committed each of the offenses with which he was charged was overwhelming. Rand presented a vigorous defense that included fact and expert witnesses and days of testimony.

Additionally, Rand offensively used the Government's self-suppression to contend that Rand never intended to obstruct justice,

arguing to the jury in closing argument that Rand did "nothing whatsoever" in response to the grand jury's investigation until March 30. J.A. 3002. The Government was powerless to correct the record by referencing Rand's 800 deletions between March 23-28. In the end, the jury was persuaded by the government's overwhelming proof of Rand's misdeeds that included direct evidence of his accounting fraud and forensic proof of his obstructive conduct. The admission of evidence that he was once accused of deleting even more e-mails than he actually deleted between March 23 and 28 would not have altered this result.

## II. The district court's other evidentiary rulings were proper.

### A. Standard of Review

This Court reviews a district court's discovery and evidentiary rulings for abuse of discretion and will only overturn those rulings if they are arbitrary or irrational. *United States v. Gillion*, 704 F.3d 284, 292 (4th Cir. 2012) (evidentiary rulings); *United States v. Richardson*, 607 F.3d 357, 368 (4th Cir. 2010) (rulings on Rule 17(c) motions). This Court will only find an abuse of discretion in a district court's ruling on a Rule 17(c) motion if the court "use[d] an erroneous legal standard or

base[d] its decision on clearly erroneous facts." *Richardson*, 607 F.3d at 368.

### B. Discussion

#### 1. The district court acted within its discretion in denying Rand's request for voluminous, irrelevant accounting records.

Federal Rule of Criminal Procedure 17(c) "implements the Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor." *In re Martin Marietta Corp.*, 856 F.2d 619, 621 (4th Cir. 1988). As the Supreme Court made clear in *Nixon*, however, the subpoena duces tecum in criminal cases is "not intended to provide a means of discovery for criminal cases"; rather, its purpose is "to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 698-99. A party seeking pretrial production of documents must demonstrate, therefore, (1) relevancy, (2) admissibility, and (3) specificity with respect to the documents. *Id.* at 700.

In this case, the district court acted well within its discretion in denying Rand's motion to issue a Rule 17(c) subpoena requiring the production of potentially millions of documents contained within seven

separate types of accounts maintained by a national corporation over an eight-year period. As the district court found, Rand did "not tailor[] his request to the entries, accounts, locations, and dates actually at issue" and "failed to justify his overly broad request." *Id.* at 3. Given the staggering breadth of the records sought by Rand, as well as the lack of apparent relevance of much of that data, the district court did not clearly err in finding that Rand had not established the relevancy of the vast majority of the accounting entries he sought or the required specificity. Instead, Rand's request amounted to the fishing expedition that *Nixon* makes clear Rule 17(c) does not permit.

Rand argues, however, that the *Nixon* standard should not apply to third-party subpoena requests. This argument fails, first, because this Court has held in the context of third-party-subpoena cases that *Nixon* governs such subpoena requests. *See Richardson*, 607 F.3d at 368; *Martin Marietta*, 856 F.2d at 621. Additionally, although Rand suggests that the plain language of Rule 17(c) supports his argument that a different standard should apply where a defendant seeks to subpoena documents from a third party, nothing in Rule 17(c) supports such a distinction. Rand's argument relies on district court cases in the

Second and Ninth Circuits that one district court has accurately noted present "a distinct minority view." *United States v. Al-Amin*, 2013 WL 3865079, at *8 (E.D. Tenn. 2013) (collecting cases). Rand cites no circuit-level authority to support his argument, nor does Rand even attempt to meet the standard set forth in the cases to which he cites. *See United States v. Nosal*, 249 F.R.D. 403, 408 (N.D. Cal. 2013); *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008).

Even if Rand's proposed "unreasonable or oppressive" standard applied, however, his subpoena request would still have been denied and properly so, because his request was precisely that: unreasonable and oppressive. Rand did not limit his request to documents relevant to the particular accounting entries the government alleged were improperly made, and responding to such a broad request that covered so much data created over eight years could fairly be characterized as oppressive.

2. The district court acted within its discretion by excluding expert testimony about Deloitte work papers.

The district court reasonably exercised its discretion to permit Rand to call his expert to testify about the opinions that expert formed as to the proprietary of the accounting while declining to permit Rand to

use his expert to admit the dated conclusions of a third-party auditor that the district court found unreliable because of Rand's misconduct. While exercising its discretion to limit Bailey's testimony, the district court did not exclude all evidence of the Deloitte work papers. In fact, Rand was free to present evidence about the information contained in the Deloitte work papers. In particular, he was free to call any of the auditors who did the work.

This decision was neither arbitrary nor irrational, but was instead well supported by the record and the law. The district court is charged with serving as a "gatekeeper" for proposed expert testimony, and must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Down Pharmaceuticals*, 509 U.S. 579, 597 (1993). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and, therefore, "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* at 595 (quotation omitted).

Rand's argument mistakenly focuses on the relevance of the work papers. But the question before the district court was not whether the work papers themselves were relevant, but whether testimony from Rand's expert in which he would merely summarize what he read in the work papers would have been relevant. Rand sought to have his expert "parrot" or summarize the documents, "rather than convey[] an independent judgment," resulting in his expert "becom[ing] little more than a backdoor conduit for an otherwise inadmissible statement." *See United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). The district court reasonably concluded that Rand's expert's testimony about what he read and what he believed Deloitte concluded, based upon his review of the work papers, would be both "not relevant" and "confusing." J.A. 2009-10. *See United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) (district courts should "recognize the risk that a particular expert might become nothing more than a transmitter of testimonial hearsay and exercise their discretion in a manner to avoid such abuses").

Additionally, as the district court later noted in affirming its decision to limit Rand's expert's testimony, Adams testified that Rand lied or withheld information from Deloitte and that the false or missing

information would have impacted Deloitte's advice and conclusions. The district court reasonably concluded based on Adams's testimony that the work papers were not reliable and properly exercised its discretion in declining to permit Rand's accounting expert to summarize them.

### 3. The district court acted within its discretion in admitting lay-opinion testimony.

Federal Rule of Evidence 701 "authorizes the admission of lay opinion testimony if it is: '(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *United States v. Offill*, 666 F.3d 168, 177 (4th Cir. 2011) (quoting Fed. R. Evid. 701). In *Offill*, this Court affirmed the admission of lay-opinion testimony in a securities-fraud case in which one of the defendant's co-conspirators described his actions as "fraudulent," "securities manipulation," and "illegal" and in which the defendant's co-conspirators testified about their compliance with security regulations. *Id*. at 177. Although the defendant in *Offill* argued that the district court abused its discretion in allowing the co-conspirators to

"giv[e] legal conclusions," this Court held that the district court acted "well within its broad discretion to admit" the challenged testimony. *Id.*

The lay-opinion testimony presented by the government in this case squarely falls within the bounds of what this Court found appropriate in *Offill*. The lay witnesses testified, *inter alia*, as to their understanding of well-established accounting principles, their understanding of specific principles (like the relationship between reserves and bonds) based upon their jobs at Beazer, and whether their own conduct and the conduct they engaged in with Rand was improper. In admitting this testimony, the district court exercised its discretion to limit the testimony more than *Offill* suggests is necessary, precluding the lay witnesses from testifying that their actions were "illegal" or "fraudulent" and instead limiting their testimony to words like "improper."

Rand's argument that "the complexity of the accounting at issue" required expert testimony is meritless. As the Second Circuit explained in *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), "[i]f the government proves that a defendant was responsible for financial reports that intentionally and materially misled investors," the statute

prohibiting accounting fraud is satisfied, and "[t]he government is not required in addition to prevail in a battle of expert witnesses over the application of individual [Generally Accepted Accounting Practice] rules." *Id.* at 125-26. Here, the district court applied this Court's decision in *Offill* and exercised its discretion to admit lay-opinion testimony on matters within the witnesses' personal experience.

4. The district court's evidentiary rulings did not result in cumulative error.

None of the rulings Rand challenges in this section of his brief was in error. But even assuming *arguendo* that each of the three rulings was error, any error was harmless, even if the errors are considered cumulatively. The government's evidence of Rand's wrongdoing, which included his confession, was overwhelming. In light of the strength of this evidence, this Court can say, with fair assurance, that the decision not to provide Rand with access to millions of accounting entries the relevance of which is not apparent, the decision to prohibit his expert from testifying about auditor work papers he did not prepare, and the decision to admit lay-opinion testimony about well-established accounting principles did not affect the result in this case.

## III. The district court did not plainly err in declining to grant a mistrial based on the government's rebuttal closing argument.

### A. Standard of Review

Rand objects to three sets of comments made by the prosecutor in rebuttal argument. As to one of the comments, Rand objected contemporaneously, and the district court sustained his objection. As to the other two sets of comments—the comments that allegedly appealed to class prejudice and the comments that Rand argues impermissibly commented on his decision not to testify—Rand did not contemporaneously object and, instead, waited until the jury was dismissed and after a one-hour court recess to move for a mistrial. *See* J.A. 3025, 3028.

In *United States v. Brainard*, 690 F.2d 1117 (4th Cir. 1982), this Court held that "[a] motion for a mistrial after the summation is not . . . a substitute for an objection at the time the prejudicial comments are made" and that in these circumstances, this Court's review is for plain error only. *Id.* at 1122 n.7, 1123. Even if Rand's objection were preserved, this Court reviews a district court's denial of a motion for mistrial for abuse of discretion only.

### B. Discussion

A new trial based on a prosecutor's improper closing argument is only warranted where the argument "so infects the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998). In addition to considering whether the remarks were, in fact, improper, this Court considers whether the remarks so prejudiced the defendant's substantial rights that he was denied a fair trial. *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010). In evaluating the extent of any prejudice, this Court considers: (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) the strength of the government's proof of guilt; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. *United States v. Baptiste*, 596 F.3d 214, 226-27 (4th Cir. 2010).

The government's rebuttal argument neither appealed to class prejudice nor improperly commented on Rand's decision not to testify.

Instead, the government made isolated remarks in direct response to evidence introduced and arguments made by Rand. Additionally, those isolated remarks neither had the tendency to mislead the jury nor to prejudice Rand, particularly, where, as here, the evidence of Rand's guilt was strong.

Although Rand argues that the government's rebuttal argument appealed to class prejudice, the comments about which Rand complains were a response to Rand's reference in his closing to a "bag of gold" and the suggestion that the government failed to produce evidence of his guilt. The government's reference to a story bought with gold was a reference to the fact that Rand's case was built on the testimony of compensated expert witnesses, none of whom had any personal knowledge of what Rand did or did not do. These comments were not a reference to Rand's personal wealth, as the district court found. Likewise, the two isolated comments—"But I thought I heard Mrs. Rand say about how rich they were" and "What was he so desperate about, he was rich"—were not comments appealing to class prejudice. They were, instead, as the district court found, responsive to Rand's argument that he had no motive to commit the crimes because he was not in need of

money, while also asserting that he falsely confessed to the FBI because he was desperate after having been fired. The government's statements responded to, and pointed out the inconsistency in, Rand's arguments.

As the district court found, the government also did not improperly comment on Rand's decision not to testify. Considered in context, the jury would naturally conclude, as the district court concluded, that government counsel, in speaking immediately after Rand's counsel and stating that "he" failed to explain why Rand was so desperate that he would make a false confession, was referring to Rand's counsel's silence on that question after counsel claimed in argument that Rand made the confession only because Rand was desperate, not to Rand's silence.

Finally, the prosecutor did not improperly vouch for Curran's credibility, but even if he had, the district court sustained Rand's objection to the argument. Rand faults the district court for not issuing a curative instruction, but Rand did not request such an instruction. Rand also suggests that a curative instruction could not have undone the harm of the government's allegedly vouching comments. As evidenced by the prejudice factor that asks whether a curative instruction was given to the jury, however, it is well established that a jury can be

instructed to ignore argument, as well as testimony, and there is no reason such an instruction could not have been requested or effectively issued.

Even if this Court were to hold that any of the government's arguments was improper, Rand cannot show that these isolated statements affected his substantial rights, where, as here, the evidence of his guilt was overwhelming. Nor can Rand show that any error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Rand received a fair trial, and a few stray comments during rebuttal closing argument that the district court found were not appealing to class prejudice or impermissibly commenting on Rand's choice not to testify do not justify the reversal of his convictions.

## IV. The district court properly calculated loss pursuant to 2B1.1.

### A. Standard of Review

This Court reviews a determination of loss for sentencing purposes for clear error. *United States v. Keita*, 742 F.3d 184, 191 (4th Cir. 2014).

### B. Discussion

Sentencing Guidelines § 2B1.1 provides for an enhancement based upon the amount of loss that was reasonably foreseeable to the

defendant; a finding of loss under § 2B1.1 "must be supported by a preponderance of the evidence" but "need not be determined with precision." *Keita*, 742 F.3d at 192. With respect to how loss should be calculated, Application Note 3(F)(ix) to § 2B1.1 provides that where the fraudulent deflation of the value of a publicly traded security is at issue "there shall be a rebuttal presumption that the actual loss attributable to the change in the value of the security . . . is the amount determined by—

> (I) calculating the difference between the average price of the security . . . during the period that the fraud occurred and the average price of the security . . . during the 90-day period after the fraud was disclosed to the market, and
>
> (II) multiplying the difference in average price by the number of shares outstanding.

U.S.S.G. § 2B1.1 cmt. 3(F)(ix).

The district court did not clearly err in finding that more than $100 million in loss was reasonably foreseeable to Rand. The government's expert testified that applying the presumptive method set forth in the commentary to § 2B1.1 based on the October 11 announcement generates a loss amount of at least $451 million. Rand's expert did not challenge this calculation, and Rand makes no argument on appeal that the guideline method could not properly be used to calculate loss, though

both parties agreed that it was not the best measure of loss in this case.

Even if the guideline method were not the appropriate method to use, however, the district court also did not clearly err in finding that the June and August announcements triggered losses that were fairly attributable to Rand's fraudulent and obstructive conduct and that exceeded $100 million. The government presented expert testimony that these announcements caused losses attributable to Rand's misconduct because the market was informed in June that Rand had been terminated for deleting documents at a time when Beazer was under federal investigation and in August that Rand may have manipulated Beazer's earnings. The credible evidence established that "markets are generally efficient" and thus "when new information is released to the market it will fairly and quickly be impounded into the price of a company stock." J.A. 3220. Thus, as the district court found, using the June and August announcements generates a more accurate loss calculation, because the October 11 announcement was not the first disclosure of the alleged fraud or Rand's obstructive behavior.

Rand argues that only the October 11 date could properly be used in calculating loss, because the date an investigation of possible

wrongdoing is announced is not the proper benchmark. Def. Br. at 59. This argument is premised, however, upon civil securities-fraud cases that are either inapplicable or distinguishable. Rand relies, for example on the Ninth Circuit's decision in *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), for the proposition that an announcement of an investigation is insufficient to establish loss causation, but *Loos* relied on the Supreme Court's earlier decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005). The Ninth Circuit has held that *Dura Pharmaceuticals* does not apply in the context of criminal sentencing. *See United States v. Berger*, 587 F.3d 1038, 1042-45 (9th Cir. 2009). The Third and Sixth Circuits have held similarly. *See United States v. Georgiou*, 777 F.3d 125, 146 (3rd Cir. 2015); *United States v. Peppel*, 707 F.3d 627, 643-45 (6th Cir. 2013). Even the two circuits that have adopted the *Dura Pharmaceuticals* causation standard in the context of criminal sentencing caution against a strict application in the criminal context, as Rand argues for in this case. *See United States v. Gushlak*, 728 F.3d 184, 196, n.9 (2d Cir. 2013); *United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005).

Additionally, these cases focus not on the effect of the announcement of the investigation, but rather, on whether a sentencing court should try to adjust for other market factors in determining loss, as required in the civil context. *See United States v. Rutkoske*, 506 F.3d 170, 178-80 (2d Cir. 2007); *Olis*, 429 F.3d at 545-49. Here, the approach adopted by the district court in finding a loss of $135 million accounted for other market forces.

As the Second Circuit noted in *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), while "[l]oss to investors who hold [stock] during the period of an ongoing fraud is not easily quantifiable[,] . . . some estimate must be made for Guidelines purposes, or perpetrators of fraud would get a windfall." *Id*. at 127. Here, after conducting an evidentiary hearing, the district court made the reasonable and conservative finding of fact, based upon the credible evidence before it, that the loss for purposes of § 2B1.1 was more than $100 million. This determination was not error, let alone clear error.

## **CONCLUSION**

Rand received a fair trial during which the district court reasonably exercised its discretion. Defendant was also sentenced

based on a loss determination that was not clearly erroneous. The government respectfully requests that this Court affirm the judgment of the district court.

**REQUEST FOR DECISION ON THE BRIEFS WITHOUT ORAL ARGUMENT**

The United States does not believe that oral argument will assist the Court in any material way and requests that this appeal be decided on the briefs.

Respectfully submitted, this the 2nd day of November, 2015.

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY
/s/Amy E. Ray
NC Bar Number #22762
Assistant United States Attorney
U.S. Courthouse, Room 233
100 Otis Street
Asheville, North Carolina 28801
Telephone: (828) 271-4661
Fax: (828) 271-4670
E-mail: Amy.Ray@usdoj.gov

/s/Maria K. Vento
Assistant United States Attorney
VA Bar No. 45960
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Facsimile: (704) 344-6629

## CERTIFICATION OF COMPLIANCE

1. This Brief has been prepared using (select and complete only one):

__x___ Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, CG Times, 14 point): WordPerfect X4, Century Schoolbook, 14 point

_____ Twelve point, monospaced typeface (such as Courier or Courier New). Specify software name and version, typeface name, and point size below (for example, WordPerfect 8, Courier 12 point):

2. EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (select and complete only one):

3._____ Pages (give specific number of pages; may not exceed 30 pages for opening or answering brief or 15 pages for reply brief); OR

_13,326__Words (give specific number of words; may not exceed 14,000 words for opening or answering brief or 7,000 for reply brief); OR

_________ Lines of Monospaced Type (give specific number of lines; may not exceed 1,300 lines for opening or answering brief or 650 for reply brief; may be used ONLY for briefs prepared in monospaced type such as Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

s/Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC

## CERTIFICATE OF SERVICE

I certify that I have this day served a copy of the above upon Defendant herein by serving his attorneys of record, as shown below, through electronic case filing.

Stephen D. Councill
Rogers & Hardin LLP

Claire J. Rauscher
Womble Carlyle Sandridge and Rice LLP

Seth P. Waxman
Brent J. Gurney
Jeannie S. Rhee
Kelly P. Dunbar
Matthew Guarnieri
Wilmer Cutler Pickering Hale and Dorr LLP

This the 2nd day of November, 2015.

s/Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC